UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------x
ROBERT JONES,

              Petitioner,

  -against-

JOSEPH T. SMITH, in his official
capacity as Warden of Shawangunk
Correctional Facility,

              Respondent.
--------------------------------------------------x

**MEMORANDUM AND ORDER**

Case No. 1: 16-cv-06470-FB

*Appearances:*
*For the Petitioner*:
CHRISTOPHER M.
JORALEMON, ESQ.
Gibson, Dunn, & Crutcher LLP
200 Park Avenue
New York, New York 10166

*For the Respondent*:
RICHARD A. BROWN, ESQ.
District Attorney, Queens County
By: JOHN M. CASTELLANO, ESQ.
Assistant District Attorney
125-01 Queens Boulevard
Kew Gardens, New York 11415

**BLOCK, Senior District Judge:**

      Robert Jones, currently serving a sentence of from twenty-five years to life, petitions the court for a writ of habeas corpus. Jones asserts that the government violated his *Brady* and due process rights, that he received ineffective assistance of trial counsel, and that he is actually innocent. For the following reasons, Jones's petition is denied.

1

# I

On September 10, 1994, in Far Rockaway, Queens, Antoine Stone was shot in the stomach and fatally wounded in the middle of the street. Jones was arrested and prosecuted by the State before a jury and the Honorable Robert C. McGann of the New York State Supreme Court, Queens County.

## A. Trial

At trial, the prosecution called three witnesses who were nearby on the night of the murder: Joan Purser,[1] Philip Englebert, and Josue Rodriguez. Several other witnesses testified as well.

Purser testified as follows. On the night of the murder, she was looking out the second-floor window of her apartment. She saw two men standing on the sidewalk below, one of whom had a bicycle. The man with the bicycle looked up at her. Both men were standing next to a street light and the street was bright and clear. After they talked for ten to fifteen minutes, the man with the bicycle crossed into the street, at which point Stone walked up to him, stopping about fifteen feet away. They stood there for about a minute and a half before Purser heard two "pow-pows." Trial Tr. 645. Stone ran away, and the man with the bicycle crossed back to the other man

---

[1] Since the trial, Purser has changed her last name to "Gennace." For consistency's sake, the Court refers to her as "Purser."

on the sidewalk, again looking up at Purser. The man with the bicycle then fled on his bicycle. Purser viewed a lineup of potential shooters on September 30, 1994. She told the detective at the lineup that Jones's "face wanted to look like the same person [she] saw at the window there." Trial Tr. 758. Purser noted, though, that she was "not one hundred percent sure" that the person she picked out of the lineup was the man on the bicycle. She also identified Jones in court, saying again that his face "wants to look like" the face of the man on the bicycle. Trial Tr. 760.

Englebert testified as follows. Coming out of the subway station on the night of the murder, he saw a police car rush by with its sirens and lights on. Soon after, he saw a man speed past on a blue and white bicycle. As he walked home, he passed a man lying on the ground, surrounded by people. Englebert identified Jones as the man on the bicycle at a lineup on September 30, 1994. He also identified Jones in court as the man on the bicycle. Further, Englebert identified a photo of a bicycle recovered from Jones's apartment as the same one that he had seen the man riding on the night of the murder.

Rodriguez testified as follows. He heard two gunshots and went to his window. Through the window he saw Stone zig-zagging on the street while talking, before falling to the ground. He went outside and asked Stone if he was alright. Stone said, "I was preaching to a drug dealer on a bike and he shot me. Why did he

3

shoot me? Why?" Trial Tr. 773. Rodriguez also found a notebook on the street near where Stone fell, which contained narcotics-related transactions. He turned the notebook over to the police.

The jury found Jones guilty. On May 28, 1996, Jones was sentenced to concurrent prison terms of from twenty-five years to life for second-degree murder, from five to fifteen years for second-degree weapon possession, and from two and one-third to seven years for third-degree weapon possession. On April 5, 1999, the Appellate Division affirmed Jones's convictions.

### B. CPL 400 Proceedings

Almost fourteen years later, in March 2013, Jones moved to vacate his judgment of conviction under Section 440.10 of New York Criminal Procedure Law. He alleged misconduct by the detectives working on his case, Gerard Weiser and Charles Lehner, and by the prosecutor on his case, Assistant District Attorney Debra Pomodore ("ADA Pomodore"), as well as ineffective assistance of his trial counsel, Barry Turner. He also submitted affidavits from Purser, Englebert, and Rodriguez, contradicting their trial testimony. The Honorable Joseph A. Zayas held a hearing under Section 440 of the New York Criminal Procedure Law ("CPL 440 hearing").

At the CPL 440 hearing, Purser recanted her identification of Jones at the lineup and at trial. She testified that the detectives had visited her many times with

4

a book of mugshots. She said that they would point to a photo of Jones and tell her to identify him as the shooter, and that they told her that they knew where her husband worked, where her children went to school, and what her immigration status was. She said that she repeatedly told them that she could not identify the man on the bicycle. She also testified that she had met with ADA Pomodore right before she testified at trial and that, when Purser told ADA Pomodore that she could not identify Jones, ADA Pomodore told Purser that she was messing things up. Purser initially stated that Jones's defense team in the CPL 440 proceedings had not told her that Jones was innocent, though she then stated on cross that they had told her they were trying to set Jones free. She stated that she had suffered for years for lying about Jones being the shooter. She had not told anyone in the interim, though, that she had lied when identifying Jones.

Englebert also recanted his identification of Jones. He said that the police had pressured him to identify Jones as the man on the bicycle. He also claimed that he saw the man on the bicycle pass him only after he had walked past Stone on the street. Englebert testified that the defense team had told him that Jones was innocent, but that he had not suspected that he had misidentified Jones in the interim.

Rodriguez testified, for the first time, that he had seen a bicycle fly by his window after he heard the gunshots. He testified that neither the police nor the

prosecutors had pressured him to testify to anything at trial. He also said that the defense team had told him that Jones was innocent and that they had not let him see his trial testimony before signing his affidavit. Further, he testified that after he submitted his affidavit in the CPL 440 proceedings, ADA Daniel Saunders had visited him and nastily threatened him with perjury prosecution and jail time.

Turner, Jones's trial counsel, testified at the CPL 440 hearing that he could not recall whether he had asked the trial prosecution to review the narcotics notebook but that he remembered the prosecutor telling him that the notebook could not be found. He also testified that he had received notice that the ballistics from the Stone murder matched the ballistics from another murder but that he did not recall receiving the full ballistics report or investigating further.

Jones's private investigator, Nelson Lassalle, testified that he spoke to Purser, Englebert, and Rodriguez, but that he had not told any of them that Jones was innocent. He also stated that he did not tell the three witnesses what to say in their affidavits.

The State presented four witnesses at the CPL 440 hearing, including Detective Lehner and ADA Pomodore. Both denied the misconduct to which Purser and Englebert had testified.

On September 15, 2014, the Supreme Court, Queens County ("the state court") denied Jones's motion to vacate his judgment of conviction in a 160-page decision. The state court found Purser's and Englebert's recantations not credible, in part due to the passage of almost twenty years between the murder and the hearing. The state court also credited the testimony of the law enforcement officials and prosecution and found no misconduct on their part. The state court denied Jones's claims that law enforcement officials and the prosecution committed *Brady* violations, that he received ineffective assistance of counsel, and that he is actually innocent.

### C. Habeas Proceedings

Jones now petitions this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, claiming that the state court improperly denied his motion to vacate the judgment of conviction. He claims that the state court's decision unreasonably applied federal law and was based on an unreasonable determination of the facts in concluding that the State did not violate his *Brady* and due process rights, that he was not deprived of effective assistance of counsel, and that he was not actually innocent.

## II

When a state court has decided a case on the merits—rather than on a procedural ground—a federal court may grant a habeas petition only if the state court's decision: (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Though "a determination of a factual issue made by a State court shall be presumed to be correct," a petitioner can "rebut[] the presumption of correctness by clear and convincing evidence." *Id.* § 2254(e)(1).

### A. *Brady* Violations

Under *Brady v. Maryland*, "the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment." 373 U.S. 83, 87 (1963). "There are three components of a true *Brady* violation: [1] The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [2] that evidence must have been suppressed by the State, either willfully or inadvertently; and [3] prejudice must have ensued." *Fernandez v. Capra*, 916 F.3d 215, 221 (2d Cir. 2019) (quoting *Strickler v. Greene*, 527 U.S. 263, 281–82 (1999)). Evidence is

material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988).

### 1. Purser's Prior Inconsistent Statements

Jones argues that the police and prosecution violated his rights under *Brady* by not disclosing the prior inconsistent statements that Purser claims she made when asked to identify the man on the bicycle. The existence of such evidence hinges on the credibility of Purser during the CPL 440 proceedings. To overcome the state court's adverse credibility determination, Jones must prove, by clear and convincing evidence, that it was unreasonable for the state court to find Purser not credible.

The state court did not unreasonably determine the facts given the evidence before it. The state court gave multiple reasons for finding that Purser's contention at the hearing that she could not identify the man on the bike was not credible. For one, the state court noted that Purser also conceded at the CPL 440 hearing that she was able to describe his clothing, that she could identify the "preacher," and that the man on the bicycle "stared" at her twice.[2] State Ct. Dec. at 92–93. The state court

---

[2] In his brief, Jones contends that Purser never used the word "stared" in her trial testimony and that the state court mischaracterized her testimony. That is disingenuous: Purser clearly stated that "[h]e was staring at [her]." Hearing Tr. at 22:15.

9

also pointed out that Purser's trial testimony included detailed descriptions of the man on the bicycle and that she did not mention any misconduct at the trial despite ample opportunity to do so "during the open-ended, non-leading questions asked by the prosecutor during the trial." *Id.* at 93.

Further, the state court found Purser's story implausible because it did not make sense for the ADAs and Detective Lehner to bring her to a lineup, to a grand jury, or to a trial to identify Jones if she had been so persistent in refusing to identify him when they were in private. In addition, the state court did not credit Purser's explanation that she identified Jones only because the detectives threatened her—mentioning that they knew where her husband worked, where her children went to school, and her immigration status—because she did not mention this fear before the CPL 440 hearing, even in her recantation affidavit. She also mentioned those threats at the hearing only after repeated questioning by the State and repeatedly saying that she could not remember.

The state court also commented on her demeanor at the hearing, noting that she testified in a shouting tone that the truth would set her free. The state court also described her testimony as "an emotional, long-winded, agenda-driven narrative that was not responsive." *Id.* at 100. It further took issue with the fact that Purser was inconsistent regarding whether the defense team had initially told her that Jones was

10

innocent, particularly because other witnesses at the CPL 440 hearing testified that the defense team had told them as much. Further, the state court cited other inconsistencies, including: whether *all* her trial testimony was false, or just the identification; whether the detectives brought a photo book with them when they first visited her; whether Jones's defense team asked her questions; whether she saw the face of the man on the bicycle; whether she recognized Stone; and whether the police told her to lie.

The Court is concerned by several aspects of the state court's reasoning. First, the state court improperly relied on Purser's failure to mention misconduct during her direct examination at trial, as it is inherent in recantations that the witness will have failed to mention such statements in their initial testimony. *See Fernandez*, 916 F.3d at 228 (acknowledging that all recanting witnesses will have lied under oath at least once). Second, the state court repeatedly characterized Purser's hearing testimony as "agenda-driven," but did not explain what her agenda might be or what she stood to gain from Jones's exoneration. State Ct. Dec. at 36, 100, 101. Indeed, it is not clear what Purser would stand to gain by falsely recanting twenty years after Jones's conviction. Nevertheless, the state court relied on various other deficiencies in declining to credit Purser's hearing testimony, including several inconsistencies in her testimony, the implausibility of her narrative, and her sometimes shouting and

11

unresponsive demeanor.³ The Court does not find that determination to be unreasonable. That credibility determination is, therefore, entitled to deference.

Further, to the extent that Jones relies on Englebert's recantation and testimony at the CPL 440 hearing, the state court was also not unreasonable in finding Englebert not credible. The record supports the state court's finding that his demeanor was hostile and evasive. Further, the fact that Englebert thought that he had made a mistake in identifying Jones only after the defense team told Englebert that Jones was innocent weakens the persuasiveness of his recantation.

Because the Court must defer to the state court's reasonable credibility determinations, it follows that there was no *Brady* evidence for the prosecutors to turn over regarding prior inconsistent statements, and Jones's *Brady* claim on that point fails.

---

³ Jones also argues that the state court erred by refusing to admit evidence showing that there was no light pole in the area because that would have corroborated Purser's alleged inability to identify the biker. Any error was harmless, though, because—as noted above—the state court relied on the fact that Purser had been able to describe the biker's clothing, that she could identify the preacher, and that she testified that the man stared at her.

## 2. Rivera Evidence

Jones also argues that the prosecution violated *Brady* by failing to disclose evidence relating to the murder of Victor Rivera. The state court concluded that the evidence was neither favorable nor material under *Brady*.

### a. Rivera Murder Information

Jones's defense team received before trial information that a shell casing recovered from the scene of the Stone murder matched a casing from the scene of another murder. Jones argues that the prosecution violated *Brady* by not also disclosing that the Rivera murder happened only eight days before and less than a mile away from the Stone murder. Jones contends that this information links an alternative perpetrator to the Stone murder. But it does nothing of the sort. All it establishes is that there is an increased likelihood that whoever murdered Stone also murdered Rivera. Though it is possible that an alternative perpetrator committed both murders, it is also possible that Jones committed both. That the two murders happened temporally and geographically close together, then, is not favorable because it does not exculpate Jones. Accordingly, Jones's claim fails because it fails to satisfy the requirement that the material be favorable.

### b. Fingerprint Evidence

Jones also argues that withheld *Brady* evidence demonstrated that Jones could not have committed the Rivera murder: fingerprint evidence taken from the Rivera murder scene. He contends that, because those fingerprints do not match Jones's, it is exculpatory evidence. But the fingerprints were lifted from a public boardwalk railing near the murder scene. That is hardly exculpatory—the murderer may not have touched the railing, and it is likely that other people on the public boardwalk did touch the railing. Accordingly, the fingerprint evidence was not favorable either, and this claim fails as well.

### B. Due Process Violations

Jones next argues that the police and prosecution violated his due process rights by using Purser's and Englebert's false testimony and by using suggestive identification procedures at lineups before trial. This argument is closely related to his contention that the prosecution violated *Brady* by withholding Purser's prior inconsistent statements, and it too hinges on the credibility of Purser and Englebert. As the Court concluded above, the state court's determination that Purser and Englebert were not credible was reasonable. Accordingly, Jones's due process claims fail as well.

## C. Ineffective Assistance of Counsel

Under *Strickland v. Washington*, 466 U.S. 668 (1984), a petitioner must demonstrate both deficient performance and prejudice to succeed on an ineffective assistance of counsel claim. A district court reviewing a state court determination on counsel's ineffectiveness must affirm unless "the state court's application of the *Strickland* standard was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). Counsel's performance is deficient if "representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. To establish prejudice, a petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

### 1. Ballistics Report

Jones claims that his constitutional right to effective assistance of counsel was violated because Turner did not investigate the ballistics report linking the Stone and Rivera murders. Even if Turner had performed deficiently by failing to investigate the ballistics report, Jones cannot establish prejudice. Because Jones has no evidence that an alternative perpetrator committed the Rivera murder, he cannot

15

establish that there is a reasonable probability that further investigation into that murder would have changed the result of his trial.

### 2. Narcotics Notebook

Similarly, Jones contends that Turner violated his right to effective assistance of counsel by failing to investigate the notebook containing information on narcotics transactions. But, because the notebook could not be found, there is no evidence that it contained information implicating another individual rather than Jones. Accordingly, Jones cannot demonstrate prejudice by showing that there is a reasonable probability that investigation of the notebook would have changed the outcome at trial.

### D. Actual Innocence

Thus far, the Supreme Court has recognized actual innocence only as a basis to allow a petitioner to overcome a procedural bar; the Court has not decided whether it can constitute a freestanding claim. *McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013). "To establish actual innocence, [a petitioner] must demonstrate that, in light of all the evidence, it is more likely than not that no reasonable juror would have convicted him." *Bousley v. United States*, 523 U.S. 614, 623 (1998) (quoting *Schlup v. Delo,* 513 U.S. 298, 327–28, (1995)) (internal quotation marks omitted)).

Jones, finally, claims that he should be released because he is actually innocent. Even if actual innocence *could* constitute a freestanding claim, Jones has failed to establish that it is more likely than not that no reasonable juror would have convicted him. Like several of Jones's claims, the actual innocence claim hinges on Purser's and Englebert's recantations. As stated above, the state court's adverse credibility determinations were not unreasonable and are, therefore, entitled to deference. Accordingly, Jones's actual innocence claim fails.

## III

For the foregoing reasons, Jones's petition is DENIED. As he has not made a substantial showing of a denial of his federal rights, a certificate of appealability will not issue. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED.**

/S/ Frederic Block_____
FREDERIC BLOCK
Senior United States District Judge

Brooklyn, New York
June 17, 2019